**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00172-CV**
_____

**IN THE INTEREST OF O.G.H.D.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 20-05-05971-CV**

**MEMORANDUM OPINION**

After a bench trial, Appellant C.L.H. ("Chase")[1] appeals the trial court's order

terminating his parental rights to his minor child O.G.H.D. ("Olani"), a one-year-old

child. The trial court also terminated the parental rights of J.N.D., Olani's mother

("Janna").[2] For reasons explained herein, we affirm the trial court's judgment.

---

[1] To protect the identity of the minor, we use pseudonyms to refer to the child, her parents, and others. *See* Tex. R. App. P. 9.8(b)(2).

[2] Janna is not a party to this appeal, and we include limited details about her only as necessary to explain the facts.

Background

On May 21, 2020, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship. The petition named Olani as the subject of the suit, Janna as the child's mother, and Chase as the child's father. At the time the petition was filed, Olani was less than one-month old.

The petition was supported by an affidavit by a Child Protective Service (CPS) worker and representative of the Department, and the affidavit stated that, on May 6, 2020, the Department received a report of neglectful supervision of the child. According to the affidavit, Janna tested positive for cocaine at the time she delivered Olani, Janna denied using drugs and knew nothing about the cocaine, and Janna tested positive for cocaine twice during pregnancy. It was unknown whether Chase knew of Janna's drug use.

The affidavit stated that the CPS worker met with Chase and Janna at the hospital and talked with Janna privately, and Janna told the CPS worker that she also has a son who lives with Janna's mother, her mother has permanent managing conservatorship of her son, and Janna has both a prior CPS history and criminal history. According to the affidavit, Janna told the CPS worker she has PTSD and anxiety, for which she takes medication. Janna denied that either she or Chase use

2

drugs, and she stated she received prenatal care and was "a hermit" during her pregnancy.

According to the affidavit, the CPS worker also talked with Chase at the hospital, who stated he had "a little bit of criminal history[]" as a result of his brother stealing his identity. Chase told the CPS worker he has CPS history because he is adopted, he takes no medication except Ibuprofen, he does not use drugs, and he has no other children.

According to the affidavit, later the CPS worker spoke with Janna's mother Sable, who stated she was unhappy that CPS was involved because the previous CPS involvement had caused Sable and Janna a "large amount of stress[.]" Sable explained that Janna was taking prescription medication, but that Sable would not allow Janna to be around children if she were using drugs. Sable described Janna and Chase as attached "like [V]elcro" because they were always together.

The affidavit reported that Janna and Chase were drug-tested on May 11, and Chase's urine test was negative, but his hair follicle test was positive for a cocaine metabolite, and Janna's hair follicle test was also positive for a cocaine metabolite. The CPS worker learned that a previous CPS investigation involving Janna's other child resulted in a "Reason to Believe" that Sable was aware of Janna's drug use but did not take protective action to ensure Janna's other child's safety. In a previous CPS case in 2014, Janna and her son Alden tested positive for cocaine and marijuana

3

when Alden was born. In 2015, CPS determined that Janna had held Alden while attempting to run the father over in her car and Janna's home was unsanitary. Alden was removed and initially placed in a Parental Child Safety Placement with Sable, and Janna was not allowed to have any access to the child.

In 2015, Janna tested positive for cocaine and marijuana, she lied about being out of state, it was believed she lied to avoid a drug test, and Sable lied for Janna and did not take protective action to ensure Alden's safety. Janna was arrested for possession and tampering with evidence and was arrested for violating her probation because she tested positive for cocaine and opiates. The Department had temporary managing conservatorship of Alden, and Alden was then placed with fictive kin.

Janna had numerous arrests that resulted in dismissal and one arrest for misdemeanor driving while intoxicated that resulted in a conviction. Chase had a conviction for misdemeanor possession of a controlled substance and three convictions for misdemeanor theft of property.

The Department was appointed Temporary Managing Conservator of Olani. Family service plans were developed for Janna and Chase. In an Order from the August 2020 Status Hearing, the court found that Chase and Janna had reviewed and understood the service plan but had not signed the plan. The court also found that the parents' visitation with Olani must be supervised to protect Olani's health and safety.

Evidence at Trial

Testimony of Janna

Janna testified that her son Alden did not live with her because CPS became involved due to her drug use and because Alden tested positive for drugs at birth. Janna admitted she did not complete the drug treatment in the 2017 CPS case for Alden. At the time of trial, Janna had been living with a friend for about five weeks, and before that, she and Chase lived with her mother. Janna testified that she wanted Olani home, but she thought Olani should go with her father because Janna said she was "not stable[]" and did not have a permanent residence. Janna denied using drugs and could not explain her positive drug test results. Janna agreed that Olani tested positive for drugs at birth according to the medical records, but Janna did not believe it was true. Janna also agreed that, at the time she began working on her required services, the records showed she was still testing positive for cocaine.

Testimony of Chase

Chase testified that he and Janna were in a relationship for about five years and they separated about two months before trial due to "differences[]" and issues related to Olani being taken away. At the time of trial, Chase testified that he had been living with a married couple in Houston for about two months, he was working two jobs, and he stated his monthly income was about $8000. According to Chase, when Olani was born, he and Janna were living with Janna's mother in Magnolia.

Chase testified that he has never used drugs or cocaine. When asked about his positive hair follicle test for cocaine, Chase acknowledged that he tested positive for cocaine but said he had no explanation for the result, he thought the test was incorrect, he works with paints, and "paints show up for drugs." Chase testified that he was court-ordered to participate in parenting collaboration and a drug assessment, and at the time of trial, he was participating in a drug and alcohol treatment program. He further testified that the Department notified him about doing a drug and alcohol evaluation about two months prior to trial and he had about eight classes of a total of twenty-four left to complete. He agreed he took a drug test in April 2021, and he said he had some paperwork showing he took the test, but he said he was not surprised to learn there were no records of the test. According to Chase, he had actively participated in the services the Department asked of him, but there was a delay in getting started that was not his fault. He testified that he had maintained visitation with Olani about every week except for "the last few weeks" when he was working two jobs and due to transportation problems. He also testified that "many times[]" the Department cancelled the visitation because someone had COVID. He agreed that he had stayed in touch with the Department during the case and that he had had "two or three[]" caseworkers during the case.

Chase testified that he wanted the court to give Olani to him or to her grandmother so that Olani could be with her brother, Alden. Chase testified that he

6

has a bond with Olani, she loves him, he loves her, and he wants to be her father "[f]orever[.]" According to Chase, he had housing that was appropriate for Olani to live with him, and he had the means and ability to provide day care for her while he was at work. Chase testified that during the case, he provided whatever he could for Olani's support, including diapers, formula, clothes, and toys, but he did not provide financial support. Chase agreed that he was not working and did not have any income at the beginning of the case.

After the Department rested, Chase testified again. Chase stated that he had gone to a drug test in April and did not refuse to give a hair follicle, and he was told his hair was too short. He denied that between May 2020 and January 2021 that he was notified to take drug tests twice a month. He testified that he notified the first caseworker of problems receiving notifications of drug testing in 2020, he denied getting notifications to do drug testing in 2020, and he testified that the only notification he received was in April 2021.

Chase testified that he missed three or four visits with Olani, he took a parenting class and parent collaboration, and he submitted a certificate of completion of both to the first caseworker. According to Chase, he took a drug and alcohol assessment in November 2020, and he believed he had complied with all the service plan requirements. Chase testified he could provide Olani a safe and stable home

environment, he was asking the court not to terminate his parental rights, and it was in Olani's best interest for him to remain her father.

Testimony of the Caseworker

The Caseworker testified that family service plans were created and approved in June 2020, and she was assigned to the case January 15, 2021. According to the Caseworker, she had tried to maintain contact with Chase, but he had not maintained contact with her. The Caseworker agreed that Chase had attended "a majority of his visits[]" with Olani.

The Caseworker testified that Janna had not completed substance abuse treatment, individual therapy, or a psychiatric evaluation. The Caseworker agreed that there were times when the Department had to cancel visitation during the case, but there had been makeup visits. She testified that she learned that Chase was employed when he said he was missing a visit due to work. She learned that Chase had gotten a new phone number when she was talking with Janna.

The Caseworker agreed that the hospital records indicated drug use by Janna at the time of Olani's birth, and drug use has been an ongoing concern that had not been alleviated by any actions by Janna or Chase. She testified that the parents were notified to do drug testing twice a month since August 2020. The Caseworker testified she had concerns about returning Olani to Janna because Janna's hair follicle and urinalysis drug test a month before trial was positive and because Janna

8

had not completed her service plan. According to the Caseworker the biggest problem with returning Olani to either parent was "[t]he concern of drug use…in both homes." The Caseworker had concerns about returning Olani to Chase because of concerns about drug use, his refusal a month prior to trial to do a hair follicle test although he took a urinalysis, he had not completed his service plan, and he had only been in his current home for a short time. In particular, the Caseworker testified that Chase had not completed parenting classes or substance abuse therapy and he had not provided proof of employment or documentation about his rent or housing. According to the Caseworker, although Chase had not completed any of his services, he had not reported to her any issues with being able to participate in services except for one time, and the Caseworker then sent a new referral. The Caseworker was unaware as to whether Chase provided any financial support to Olani during the case. The Caseworker agreed that Chase's urinalysis drug test in 2021 was negative, she did not get drug test results for a hair follicle test, and on cross-examination, she testified that she was not aware that there were no records of Chase's drug test from earlier in the year.[3]

---

[3] Results of drug testing for Chase were admitted into evidence that reflect he tested positive for cocaine and cocaine metabolites on May 11, 2020.

9

Testimony of the Foster Mother

The Foster Mother testified that Olani was placed with her on May 21, 2020. To alleviate Janna and Chase's concerns, she and her husband maintained contact with them, including making a journal with updates and pictures to send when Olani had weekly visitations. According to the Foster Mother, Janna and Chase missed some visitations—typically missing several consecutive weeks—but "they made more than they missed." The Foster Mother also testified that Janna and Chase had sent clothes and baby food for Olani.

The Foster Mother testified that Olani had low birth weight and has remained small, but she was happy, growing well, and walking. At Olani's one-year checkup, she was referred to audiology and ECI for a concern about speech development. Olani has also had some issues with reflux, colic, and sleeping.

The Foster Mother also testified that "[i]f Olivia becomes available for adoption, there's nothing that we would love more." She and her husband have three young sons who love Olani, and Olani loves the boys. She testified that she would do what she could to ensure Olani had a relationship with her brother.

Testimony of the Court Appointed Special Advocate (CASA)

The CASA testified that she was assigned to the case on June 5, 2020, and most of her communication has been with Janna. The CASA did not believe that Janna or Chase had proven sobriety or had a safe and stable environment for

reunification, and she believed it was in Olani's best interest for Janna's and Chase's parental rights to be terminated. According to the CASA, Janna's and Chase's visitations with Olani had been inconsistent and at times they were not able to attend or would not respond to messages confirming appointments. The CASA testified that Chase did not participate in many group chats, he was not involved in most of the communication outside of visits, but he engaged with Olani during visits. According to the CASA, eight visits were cancelled by CPS, in part due to COVID, and the parents cancelled "[c]lose to 30[]" visits.

The CASA testified that Olani was progressing well developmentally, she was energetic and happy, and she seemed to be very healthy. The CASA thought the foster home was a safe and stable environment, interaction in the foster home was going very well, and Olani's needs were being met.

A certified copy of a 2017 judgment against Janna for driving while intoxicated was admitted into evidence. Results of drug testing were admitted into evidence and showed the following positive drug tests for Janna:

- cocaine, cocaine metabolites, and marijuana on May 25, 2017;
- cocaine and cocaine metabolites on January 10, 2018;
- cocaine metabolites on January 31, 2018;
- cocaine and cocaine metabolites on May 11, 2018;
- cocaine and marijuana on May 14, 2018;
- cocaine and cocaine metabolites on May 11, 2020; and
- cocaine, cocaine metabolites, and marijuana on April 16, 2021.

Results of drug testing for Chase were admitted that reflect he tested positive for cocaine and cocaine metabolites on May 11, 2020. Medical records for Olani were admitted that reflect she tested positive for a cocaine metabolite at birth. Medical records for Janna at the time of Olani's birth were admitted that include diagnoses of "drug use complicating childbirth" and "cocaine abuse[.]" Janna's and Chase's family service plans were also admitted into evidence.

After the bench trial, on June 3, 2021, the court entered a final order terminating Janna's and Chase's parental rights to Olani. The trial court found that the Department had shown, by clear and convincing evidence, that it was in Olani's best interest to terminate Janna's and Chase's parental rights. The trial court found that the Department had shown by clear and convincing evidence that Janna had knowingly allowed Olani to remain in conditions that endangered her physical or emotional well-being and engaged in conduct or knowingly left the child with persons who engaged in conduct that endangered her physical or emotional well-being. The trial court also found that the Department had shown by clear and convincing evidence that Janna failed to comply with the provisions of a court order that specifically established the actions necessary for Janna to obtain the return of Olani, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from her under Chapter 262 for the abuse or neglect of the child. The trial court also found

that the Department had shown by clear and convincing evidence that Chase had knowingly allowed Olani to remain in conditions that endangered her physical or emotional well-being and engaged in conduct or knowingly left her with persons who engaged in conduct that endangered her physical or emotional well-being. The trial court also found that the Department had shown by clear and convincing evidence that Chase failed to comply with the provisions of a court order that specifically established the actions necessary for Chase to obtain the return of Olani, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from her under Chapter 262 for the abuse or neglect of the child.

Chase filed a Request for Findings of Fact and Conclusions of Law and a Notice of Appeal. The appellate record includes no Findings of Fact and Conclusions of Law subsequent to Chase filing his request, nor any Notice of Past Due Findings of Fact and Conclusions of Law filed by Chase. *See* Tex. R. Civ. P. 297.[4] Janna did not file a Notice of Appeal.

---

[4] The failure to file a notice of past due findings of fact and conclusions of law waives the right to complain on appeal about the trial court's failure to file findings and conclusions. *In re G.M.*, No. 14-20-00044-CV, 2021 Tex. App. LEXIS 3610, at *14 (Tex. App.—Houston [14th Dist.] May 11, 2021, no pet.) (citing *Las Vegas Pecan & Cattle Co., Inc. v. Zavala Cty.*, 682 S.W.2d 254, 255 (Tex. 1984)); *In re A.I.G.*, 135 S.W.3d 687, 694 (Tex. App.—San Antonio 2003, no pet.).

Issues

Appellant raises the following issues on appeal:

[1]   There is legally and factually insufficient evidence to support the Trial Court's finding that [Chase's] rights were terminated under Section 161.001(b)(1)(D) of the Texas Family Code.
[2]   There is legally and factually insufficient evidence to support the Trial Court's finding that [Chase's] rights were terminated under Section 161.001(b)(1)(E) of the Texas Family Code.
[3]   There is legally and factually insufficient evidence to support the Trial Court's finding that [Chase's] rights were terminated under Section 161.001(b)(1)(O) of the Texas Family Code.
[4]   There is legally and factually insufficient evidence to support the Trial Court's finding that the termination of [Chase's] parental rights were in the best interest of [Olani.]
[5]   The Trial Court erred in admitting Petitioner's Exhibits 5 and 9 for the reason that as business records they contained third-party hearsay and were unreliable, which resulted in an erroneous judgment.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

14

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

Admission of Business Records Evidence

On appeal, Chase argues that because Exhibits 5 and 9 are inconsistent and there is no explanation for the inconsistency, there is a question about the reliability of the records contained in these two exhibits. Appellant concedes that both exhibits meet the formal requirements of Rule 803(6), but Appellant argues that the "trustworthiness of the exhibits is not evident[] due to the discrepancies[,]" the exhibits should not have been admitted, and the error resulted in an erroneous judgment.

At trial, Chase objected to the admission of reports of drug testing results based on hearsay and reliability. Exhibit 5 includes an Affidavit for Business Records by the custodian of records for Texas Alcohol & Drug Testing Service, Inc. dated May 26, 2020, and also includes a Test Results report that reflects that Chase tested positive for cocaine and cocaine metabolites on May 11, 2020. Exhibit 9 includes a certification by the custodian of records for Texas Alcohol & Drug Testing Service, Inc. dated April 23, 2021, that states a search of files revealed no testing records for Chase. Chase argued at trial that the inconsistency between the business records raises a question about the reliability of Exhibit 5. The Department argued the exhibits were not inconsistent because Exhibit 9 was created after Exhibit 5, and Exhibit 9 merely reflected that "no further records were found to be within the Texas Alcohol and Drug Testing Service." Both exhibits were admitted. In

16

moving for a directed verdict at the end of the Department's case in chief, Chase argued in part that "there is evidence contrary to the affidavit submitted by the drug testing company that my client did test…negative for cocaine and they have no records of him taking a test. So[,] we have an inconsistency there." The court denied the motion for a directed verdict.

We review a trial court's decision to admit evidence for an abuse of discretion. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court abuses its discretion when it acts without regard to guiding rules or principles. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Even if the trial court abused its discretion in admitting certain evidence, reversal is only appropriate if the error was harmful—that is, it probably resulted in an improper judgment. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing Tex. R. App. P. 44.1, 61.1; *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). In determining whether an erroneous admission of evidence is harmful, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *See Armstrong*, 145 S.W.3d at 144. The erroneous admission of evidence is harmless if the evidence is merely cumulative of other evidence admitted at trial. *See id.*

When the opposing party timely voices a hearsay objection, the other party offering the evidence bears the burden of showing that the evidence is either not

hearsay or that it fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004); *see also* Tex. R. Evid. 802. Rules 803 and 804 outline exceptions to the hearsay rule and 803 includes an exception for certain business records. We conclude that the trial court did not abuse its discretion in admitting the evidence because the trial court could have reasonably determined that the business record exception applied to the drug testing records. For example, Texas Rule of Evidence 803(6) provides an exception to the hearsay rule for business records if:

> (A) the record was made at or near the time by - or from information transmitted by - someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted business activity;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and
>
> (E) the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.
>
> "Business" as used in this paragraph includes every kind of regular organized activity whether conducted for profit or not.

*Id.*; *see also* Tex. R. Evid. 902(10) (providing that certain business records accompanied by an affidavit as outlined in the rules are self-authenticating). Under Rule 803(6), the records of a business may include records created by that business

18

and in some instances records from a third party that are incorporated into the records of the other business if: (1) the document is incorporated and kept in the course of the testifying witness's business, (2) that business typically relies upon the accuracy of the document's content, and (3) the circumstances otherwise indicate the document's trustworthiness. *See In re J.N.P.*, No. 09-20-00245-CV, 2021 Tex. App. LEXIS 1827, at **20-21 (Tex. App.—Beaumont Mar. 11, 2021, no pet.) (mem. op.) (collecting cases from the Courts of Appeal addressing the admissibility of third-party documents as business records of a different business).

Because the report of the drug testing was accompanied by an affidavit that complies with Texas Rule of Evidence 902(10)(B), the only question regarding its admissibility was whether the drug test report showed sufficient indicia of trustworthiness to bring it within the business-records exception to the hearsay rule. *See* Tex. R. Evid. 803(6); *F.C. v. Dep't of Family & Protective Servs.*, No. 03-19-00625-CV, 2020 Tex. App. LEXIS 119, at **16-17 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.) (citing *In re A.T.*, No. 2-04-355-CV, 2006 Tex. App. LEXIS 1882, at **12-13 (Tex. App.—Fort Worth Mar. 9, 2006, pet. denied) (mem. op.)). The business-records affidavit accompanying Chase's May 2020 drug test results states that the drug test "utilize[ed] strict chain of custody procedures" and "was performed utilizing GC/MS (gas chromatography/mass spectrometry) instruments by a certified scientist and reviewed by a licensed medical review

19

officer." The affidavit further states that a record of the test result was kept in the regular course of business of the Texas Alcohol and Drug Testing Service and that it is in the regular course of business of that entity for an employee or representative with knowledge of the act, event, condition, opinion, or diagnosis to record the information at or reasonably near the time it occurred. The drug test itself was signed by a Certified Medical Review Officer—an M.D.—verifying that the test was positive. The test result identifies the collection site, date, type of panel test used, and name of the lab that performed the test. Attached to the business-records affidavit was (a) the laboratory report indicating the quantitative results, identifying the lab as "DHHS Certified," and (b) the "Forensic Drug Testing Custody and Control Form" that accompanied the sample Chase provided as it was transported from the testing facility to the laboratory. We conclude that the trial court did not abuse its discretion in determining that the drug test and accompanying affidavit showed sufficient indicia of trustworthiness to be properly admitted as a business record. *See F.C.*, 2020 Tex. App. LEXIS 119, at \*\*16-18. Inconsistencies between Exhibits 5 and 9—if any—were for the trial court to resolve in its role as factfinder. *See Webb*, 590 S.W.3d at 578.

We also note that even if the court erred by admitting the exhibits, any such error would be harmless because the same evidence was admitted elsewhere without objection. *See In re E.A.K.*, 192 S.W.3d 133, 148 (Tex. App.—Houston [14th Dist.]

20

2006, pet. denied) (Any error in the admission of evidence is harmless if the objecting party permits the same or similar evidence to be introduced without objection.). Chase acknowledged that his initial hair follicle test showed a positive result for cocaine. Also, the family service plan, which was admitted without objection as Petitioner's Exhibit 11, stated that Chase's hair follicle test at the outset of the case was positive for "benzoylecgonine, cocaine metabolite and norcocaine." Therefore, even assuming the trial court erred in admitting the drug test reports, we conclude any such error was harmless. *See id.*

Appellant also argues that there is no evidence establishing the reliability of the third-party laboratory, citing to *Philpot v. State*, 897 S.W.2d 848, 852 (Tex. App.—Dallas 1995, pet. ref'd). Appellant did not make this objection at trial. Therefore, he has not preserved this argument for appeal. *See* Tex. R. App. P. 33.1; *Wohlfahrt v. Holloway*, 172 S.W.3d 630, 639-40 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (To preserve error, a party's argument on appeal must comport with its argument in the trial court.). We find no abuse of discretion by the trial court in admitting Exhibits 5 and 9, and we overrule Appellant's fifth issue.

### Statutory Grounds D and E

We are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)(1)(D) or (E) if challenged. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to one of these, it will not be necessary

21

to address the other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is all that is necessary to affirm a termination judgment. *Id.* at 232-33. Because the evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, No. 09-10-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003,

pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id*. at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.— Texarkana 2004, no pet.)). "A finding of endangerment under subsection E, however, may be based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d at 360). "'[E]ndanger' means to expose to loss or injury[.]'" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *In re L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*,

129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Abusive or violent conduct by a parent may produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, not pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston

24

[1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's continued drug use when the custody of his or her child is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Chase testified that he and Janna lived with Janna's mother when Olani was born. Janna's medical records from her delivery reflected a diagnosis of "drug use complicating childbirth" and also "cocaine abuse[.]" Olani's medical records from birth reflect that when she was born, she tested positive for a cocaine metabolite. Drug testing records for Janna showed positive drug tests for cocaine, cocaine metabolites, or marijuana in May 2017, January 2018, May 2018, May 2020, and April 2021—both before and after Olani was removed from the home. Chase tested positive for cocaine and cocaine metabolites on May 11, 2020—around the time Olani was removed from the home. Chase testified that he and Janna had been together for about five years and at the time of Olani's birth he and Janna were living with Janna's mother. Janna's son Alden was removed from Janna's home in 2017 due to Janna's drug use and because Alden also tested positive for drugs when he was born. Janna admitted she did not complete drug treatment in the 2017 case when Alden was removed. The Caseworker in Olani's case testified that Janna and Chase

were notified they should complete drug testing twice a month during the pendency of the case, and according to the Caseworker, Chase refused to do a hair follicle test in April 2021. The Caseworker also testified that neither Janna nor Chase had completed substance abuse treatment and that drug use has been an ongoing concern that had not been alleviated by any actions by Janna or Chase.

A parent's refusal to submit to drug testing may be considered as evidence that he or she is continuing to abuse drugs. *In re T.R.L.*, No. 10-14-00290-CV, 2015 Tex. App. LEXIS 2178, at *14 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) (trial court could reasonably infer parent avoided taking drug tests because she was using drugs).

Despite the fact Janna and Chase both denied using drugs, neither had any explanation for their positive drug tests during the pendency of this case, nor did they have any explanation for the fact that the test confirmed that Olani was born with cocaine in her system. Chase denied that he was notified he should submit for drug testing twice a month, but the trial judge as the trier of fact was free to believe the testimony of the Caseworker that Chase had been told to submit to drug testing twice a month. And the trial court could have inferred that Chase avoided taking drug tests because he was using drugs. *Id.* Based on the positive drug tests of Chase

26

and Janna, as well as the lengthy history of drug use by Janna, coupled with the testimony that Chase and Janna had been together for approximately five years and were always together, the trial court also could have concluded that Chase was aware of Janna's drug use before and while she was pregnant with Olani, that Chase consciously disregarded the risk, and that both Janna and Chase used drugs while Janna was pregnant with Olani.

Appellant argues that the evidence shows no causal connection between Chase and any endangerment to Olani. Chase cites to *In re L.C.L.*, 599 S.W.3d 79, 84-86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). In *L.C.L.*, the Fourteenth Court stated that "drug use alone" would not be sufficient evidence of endangerment under subsection P, and the court concluded that the statute requires evidence that a parent used a controlled substance "in a manner that endangered the health and safety of the child."[5] In a divided en banc opinion, the court held that the evidence was insufficient to support a finding of endangerment for lack of a causal connection between the drug use and the endangerment of the child, but the evidence was sufficient to support termination under subsection O. Nonetheless, the appellate court remanded the case to the trial court for a new trial on best interest only. *Id.* at

---

[5] Subsection P provides that the court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent used a controlled substance "in a manner that endangered the health or safety of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(P). In this case, the trial court did not terminate Chase's parental rights under subsection P.

90-91. Therefore, in *L.C.L.*, the Fourteenth Court's finding as to endangerment was not outcome-determinative. *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.) (an appellate court may affirm a trial court's final order of termination based on any one ground because only one statutory predicate is necessary for termination of parental rights). In light of the record before us and the guidance that has been provided by the Texas Supreme Court, we do not find *In re L.D.L.* persuasive or controlling.

The Texas Supreme Court has stated that endangering conduct is not limited to actions directed towards the child and may include actions before the child's birth, including evidence of drug abuse. *See In re J.O.A.*, 283 S.W.3d at 345. This Court has stated that a parent's pattern of drug abuse supports a finding of endangerment even if there is no evidence that such drug use actually injured the child. *See In re T.B.*, No. 09-20-00172-CV, 2020 Tex. App. LEXIS 8938, at *26 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (citing *Vasquez*, 190 S.W.3d at 196); *In re A.M.*, No. 09-19-00075-CV, 2019 Tex. App. LEXIS 7941, at *55 (Tex. App.—Beaumont Aug. 29, 2019, pet. denied) (mem. op.). The Amarillo Court of Appeals has also explained that "[t]his court and other courts have consistently found that a parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in [subsection] E." *In re T.C.*, Nos. 07-18-00232-CV & 07-18-00233-CV, 2018 Tex. App. LEXIS 6768, at *8 (Tex. App.—

28

Amarillo Aug. 23, 2018, pet. denied) (mem. op.); *see also S.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-21-00142-CV, 2021 Tex. App. LEXIS 6392, at *12 n.3 (Tex. App.—Austin Aug. 6, 2021, no pet. h.) (mem. op.) (acknowledging the outcome in *In re L.C.L.* but concluding that endangerment need not be established as an independent proposition but may be inferred from parental misconduct alone) (citing *M.D. v. Tex. Dep't of Family & Protective Servs.*, No. 03-20-00531-CV, 2021 Tex. App. LEXIS 3310, at *18 n.4 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.)).

The evidence in this case reflects that Olani was not merely exposed to drug abuse. She was born with a cocaine metabolite in her system, the delivery was complicated by Janna's drug use, Chase and Janna lived together at the time Olani was born, and Chase and Janna both tested positive for cocaine metabolites when Olani was born and when Olani was removed by CPS. The record provides clear and convincing evidence that Chase's acts or omissions in using drugs and his other acts or omissions allowing his unborn child to be subjected to Janna's drug use while she was pregnant with Olani, and while Chase was with Janna, endangered the health and safety of Olani. *See In re A.J.F.*, No. 07-20-00242-CV, 2021 Tex. App. LEXIS 947, at *1, **8-9 (Tex. App.—Amarillo Feb. 4. 2021, no pet.) (mem. op.) (finding the evidence sufficient to support a finding of endangerment where, among other

29

things, both parents had a history of substance abuse, the parents lived together, and both mother and child tested positive for drugs when the child was born).

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Chase, through his individual acts or omissions or a course of conduct, endangered Olani's physical or emotional well-being. We conclude that the Department established, by clear and convincing evidence, that Chase committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Chase endangered Olani. *See In re J.F.C.*, 96 S.W.3d at 266.

We need not address the sufficiency of the evidence to support a violation of subsection O. *See In re D.S.*, 333 S.W.3d at 388. We overrule issues one and two, and we decline to address issue three.

### Best Interest of the Child

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong

30

presumption that the best interest of a child is served by keeping the child with her parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116. The Texas Supreme Court has articulated several additional factors that may be considered when determining

whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Because stability and permanence are important in a child's emotional and physical development, termination of parental interests may be in the child's best interest when a parent is unable to provide a stable environment or a reliable source for food, clothing, shelter, and emotional support. *See In re J.D.*, 436

32

S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure a parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

The court heard evidence that Chase had tested positive for cocaine shortly after Olani was removed from the home. Chase did not have an explanation for his positive drug test except that he claimed that he works with paints and "paints show up for drugs." The Caseworker testified that Chase failed to submit to a hair follicle test and had not complied with drug testing requirements. Although Chase stated he

33

was working at the time of trial, the Caseworker testified that he had not provided proof of employment or proof of income. Chase stated he was staying with another couple, and he had only been in his current home for about two months, and the Caseworker testified that he had not provided proof of adequate housing, or of a residence or rent paid.

The Caseworker also testified that Chase had not completed his service plan—specifically, he had not completed parenting classes or substance abuse therapy, he had not maintained contact with the Caseworker, and he had not provided proof of housing or employment. According to the Caseworker, Chase provided no financial support for Olani during the case. The CASA testified that Janna and Chase cancelled "[c]lose to 30[]" visitations with Olani during the case. The Caseworker and the CASA both testified that it was in Olani's best interest for Janna's and Chase's parental rights to be terminated. The Foster Mother testified that Olani is happy, growing well, and that she and her husband would like to adopt Olani. The CASA testified that Olani was progressing well in her foster placement and that the foster placement was a safe and stable environment.

Having considered the evidence related to best interest and deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in

Olani's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Chase's parental rights is in Olani's best interest, and we overrule issue four.

We affirm the trial court's order of termination.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 8, 2021
Opinion Delivered September 30, 2021

Before Golemon, C.J., Horton and Johnson, JJ.